IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARGARET QUIGLEY | : | |
| | : | |
| v. | : | Civil No. CCB-14-2227 |
| | : | |
| MERITUS HEALTH, INC., *et al.* | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM**

Plaintiff Margaret Quigley, proceeding *pro se,* filed this action alleging interference with her rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, by her former employer Meritus Health, Inc., Meritus Medical Center, Chris Bumbaugh, and Sherry Mace (collectively, "Defendants"). Now pending are the parties' cross-motions for summary judgment, along with the oppositions and replies to those motions. (ECF Nos. 36, 38, 40, 41). The issues have been fully briefed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, the court will deny the cross-motions for summary judgment.

**BACKGROUND**

In 2007, Quigley was hired by defendant Meritus Health, Inc. to work at Defendant Meritus Medical Center ("the Hospital") as an ultrasound technician. (Quigley Aff. 1 ¶ 3, Pl.'s Mot. Summ. J. Ex. A, ECF No. 38).[1] Defendant Mace, the Radiology Manager at the Hospital,

---

[1] Defendants have filed two affidavits from Mace. Her August 20, 2015 affidavit (which was subsequently filed again with a minor edit and a new date of October 1, 2015) will be referred to herein as "Mace Aff. 1," and her "second affidavit" dated October 1, 2015 will be referred to as "Mace Aff. 2." Quigley asserts that the first Mace affidavit is deficient in form and substance. Because no significant deficiencies are apparent, both Mace affidavits have been considered in adjudicating this motion. Quigley has also filed two affidavits. Her September 15, 2015 affidavit will be referred to as "Quigley Aff. 1," and her affidavit dated October 17, 2012 (which likely, based on context, was actually signed October 17, 2015) will be referred to as "Quigley Aff. 2."

supervised Quigley throughout her employment. (Mace Aff. 1 ¶ 3, Defs.' Mot. Summ. J. Ex. A, ECF No. 36-2). Defendant Bumbaugh works as Director of Human Resources for Meritus Health, Inc. (Email from Chris Bumbaugh to Margaret Quigley, Defs.' Mot. Summ. J. Ex. B-13, ECF No. 36-3).

The Hospital is a trauma center, and is required to have ultrasound technician coverage on a 24/7 basis. (Mace Aff. 1 ¶ 4, Defs.' Mot. Summ. J. Ex. A). In 2011 and 2012, the Hospital employed six full-time ultrasound technicians, who worked day, evening, and night shifts. (Quigley Dep. 21-22, Defs.' Mot. Summ. J. Ex. B, ECF No. 36-3). Ultrasound technicians working night and weekend shifts were paid a higher rate. (Quigley Aff. 2 ¶ 2, Pl.'s Reply Ex. E, ECF No. 41-1). Beginning in 2008, Quigley worked a permanent schedule of night shifts, including weekend nights.[2] (Quigley Aff. 1 ¶¶ 5, 6, Pl.'s Mot. Summ. J. Ex. A). Since 2011, the other full-time ultrasound technicians regularly rotated among day, evening, and night shifts, and had no fixed schedule. (*Id.* ¶ 7).

Quigley took FMLA leave on several occasions. In both 2011 and 2012, Quigley exhausted her twelve weeks of FMLA entitlement. (*Id.* ¶¶ 12, 19, 23, 26, 28; Letter from Tammy Beachley to Margaret Quigley, Defs.' Mot. Summ. J. Ex. B-5, ECF No. 36-3). In late November of 2011, the Hospital experienced a failure in ultrasound coverage during one of Quigley's assigned night shifts. (Mace Aff. 1 ¶ 5, Defs.' Mot. Summ. J. Ex. A; Quigley Aff. 1 ¶ 21, Pl.'s Mot. Summ. J. Ex. A). There were some additional coverage difficulties in late 2011 and early 2012. (Mace Aff. 1 ¶ 6, Defs.' Mot. Summ. J. Ex. A). As a result, beginning as early as November, 2011, the Hospital began to discuss adopting a rotating shift for all ultrasound

---

[2] Quigley occasionally filled in evening or day shifts as overtime or for the purposes of filling out an 80 hour pay period, but not as part of her regular schedule. Quigley Aff. 1 ¶¶ 5, 6, Pl.'s Mot. Summ. J. Ex. A, ECF No. 38.

technicians. (*Id.* ¶¶ 7, 8, 9). Mace had meetings with the ultrasound technicians in February and March of 2012 to discuss schedule changes. (*Id.* ¶¶ 8, 9).

In anticipation of foot surgery, Quigley asked for and received approved FMLA leave, scheduled to begin April 6, 2012. (Letter from Tammy Beachley to Margaret Quigley, Defs.' Mot. Summ. J. Ex B-4, ECF No. 36-3). However, Quigley became ill on March 7, 2012, and did not return to work from that date until her scheduled FMLA leave began. (Email from Linda Walla to Sherry Mace, Pl.'s Mot. Summ. J. Ex. C-7, ECF No. 38). In mid-March, during the time Quigley was ill before her scheduled leave, Mace and other Meritus employees corresponded by email about Mace's desire to change Quigley's schedule to day shift work. (*Id.*; Meritus Internal Email Correspondence, Pl.'s Mot. Summ. J. Ex. C-6). However, Quigley never worked day shifts in March, since she remained on leave. (*Id.*)

On May 28, 2012, Quigley's 2012 FMLA leave was exhausted. (Letter from Tammy Beachley to Margaret Quigley, Def. Mot. Summ. J. Ex. B-5, ECF No. 36-3). Quigley emailed Mace to notify her of her intent to return to work on May 30, 2012. (Email from Margaret Quigley to Sherry Mace, Def. Mot. Summ. J. Ex. B-8, ECF No. 36-3). At that time, Mace told Quigley that she would be placed in a rotational shift schedule with the other ultrasound technicians upon her return. (Email from Sherry Mace to Margaret Quigley, Def. Mot. Summ. J. Ex. B-10, ECF No. 36-3). Quigley objected, stating that the change would impact her financially and would not allow her to care for her family obligations. (Emails Between Margaret Quigley and Sherry Mace, Chris Bumbaugh, and Tammy Beachley, Def. Mot. Summ. J. Ex. B-10, B-11, B-13, ECF No. 36-3). The Hospital, through Mace and Bumbaugh, took the position that the decision to move to a completely rotational schedule had been planned for some time to best serve the Hospital and its employees and patients. (*Id.*) Because Quigley refused to work the

rotating shift, her last day at the Hospital was June 4, 2012. (Quigley Aff. 1 ¶ 34, Pl.'s Mot. Summ. J. Ex. A). She then filed the instant action, alleging that the Hospital's failure to reinstate her to her shift interfered with her FMLA rights.

## ANALYSIS

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Whether a fact is material depends upon the substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). Conclusory or speculative allegations do not create a genuine issue of material fact, nor does a "mere scintilla of evidence[.]" *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 649 (4th Cir. 2002) (citing *Phillips v. CSX Transp., Inc.,* 190 F.3d 285, 287 (4th Cir. 1999)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962) (per curiam)). Moreover, complaints filed by *pro se* litigants should be liberally construed. *See De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). However, the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses

from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

The FMLA creates two types of claims. The first includes interference claims, which are based on alleged attempts by an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right protected by the Act, 29 U.S.C. § 2615(a)(1); interference claims encompass violations of the right to be reinstated to a similar position after taking leave. The second is based on retaliation; these claims result from an employer's allegedly "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by" the FMLA, *id.* at § 2615(a)(2). Quigley's amended complaint is limited to an interference claim. To establish an FMLA interference claim, an employee must prove that: (1) she was an eligible employee; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled. *Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 516 (D. Md. 2008) (citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). Specifically, Quigley alleges that Defendants violated her right to be reinstated to her position on the night shift.

The FMLA generally entitles an employee to return to the same shift or equivalent work schedule she had prior to taking FMLA leave. *See* 29 C.F.R. § 825.215(e)(2). Some courts have found a change from a permanent day shift to a permanent overnight shift raises a question of fact whether the schedules were equivalent for purposes of the FMLA. *See, e.g.*, *Hunt v. Rapides Healthcare Sys. LLC*, 277 F.3d 757, 766 (5th Cir. 2001). In this case, Quigley claims that the schedules were not equivalent for two reasons: first, that the rotating shift did not allow her to accommodate her family responsibilities, and second, that the pay would not be equivalent in the

rotating shift schedule because her permanent night and weekend shift schedule guaranteed her higher rates of pay. Defendants do not contest that Quigley's overall pay would be lower if she were working more day shifts.

Instead, Defendants contend that no FMLA violation occurred because the "shift reorganization" to a completely rotational schedule would have occurred regardless of Quigley's FMLA leave. The "shift reorganization" significantly changed only Quigley's schedule, since the undisputed evidence reflects that the other ultrasound technicians were already working on rotating shift schedules (and had been covering Quigley's night shifts during her FMLA leave). While their rotating schedules would now regularly incorporate shifts that had been covered on a permanent basis by Quigley, the fundamental nature of their rotating shift schedules would remain unchanged. Defendants have established that there was some discussion about implementing a changed shift schedule before Quigley went out on leave in March, 2012. However, the evidence does not conclusively establish that any determination was made at that time, and does not conclusively establish the nature of the changed schedule under contemplation during that time frame. *See, e.g.*, (Staff Meeting Notes, Defs.' Mot. Summ. J Ex. A-1, ECF No. 36-2) ("The primary purpose of the meeting will be to discuss the creation of a new scheduling model. The meeting is not mandatory but everyone is encouraged to attend since everyone will be affected by the new model."). In fact, Quigley asserts that the February, 2012 meeting resulted in implementation only of a new rotational back up call schedule, which did not affect her permanent night shift schedule. (Quigley Aff. 2 ¶¶ 3, 4, Pl.'s Reply Ex. E). Emails between Meritus employees in March, 2012 reflect an intent to have Quigley work day shifts, at least temporarily, but make no reference to a completely rotational schedule, despite Mace's assertion that the "decision to implement a completely-rotational schedule for ultrasound technicians was

made prior to Plaintiff's scheduled leave for surgery." *Compare* (Meritus Internal Email Correspondence, Pl.'s Mot. Summ. J. Ex. C-6, C-7, ECF No. 38) *with* Mace Aff. 2 ¶ 4, Defs.' Reply Ex. C, ECF No. 40-3). The fact that discussions of some type occurred prior to Quigley's scheduled leave does not establish that any formal decision had been made or implemented, and does not rule out the possibility that Defendants' ultimate decision to end Quigley's permanent night shift assignment and move to a completely rotational schedule was affected, in some way, by Quigley's FMLA leave. Thus, a genuine dispute of fact remains as to whether the "shift reorganization" implemented upon Quigley's return would have occurred regardless of her FMLA leave, rendering summary judgment for either party inappropriate.

## CONCLUSION

For the foregoing reasons, the cross-motions for summary judgment will be denied. A separate Order follows.

Dated: February 26, 2016              /S/
                                      Catherine C. Blake
                                      United States District Judge