IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARGARET QUIGLEY | : |
| | : |
| v. | : Civil No. CCB-14-2227 |
| | : |
| MERITUS HEALTH, INC., *et al.* | : |

# MEMORANDUM

Plaintiff Margaret Quigley, proceeding *pro se*, filed this action alleging interference with her rights under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, by her former employer Meritus Health, Inc., Meritus Medical Center, Chris Bumbaugh, and Sherry Mace (collectively, "Defendants"). A bench trial was held on January 20, 2017. After hearing the testimony of the witnesses and considering the exhibits, the court concludes the Defendants did not violate the FMLA.[1] Pursuant to Federal Rule of Civil Procedure 52(a), the following memorandum constitutes the court's findings of fact and conclusions of law.

## BACKGROUND

Ms. Quigley worked as an ultrasound technician at Meritus Medical Center ("the Hospital") from 2007 to 2012. Ms. Quigley took FMLA leave in 2010, 2011, and 2012, (Pl.'s Trial Exs., [hereinafter PTX], 16-A, 16-B), and the Hospital granted her leave every time she requested it, (*see* Def.'s Trial Exs., [hereinafter DTX], 1-A through 1-J).

The Hospital is a level-three trauma center and is required to have ultrasound coverage available on a 24/7 basis. From sometime in 2008 until December 2011, Ms. Quigley worked the

---

[1] The witnesses included Ms. Quigley, Sherry Mace, and Chris Bumbaugh.

weekend night shift exclusively.[2] She was the only sonographer with such a permanent shift: all other sonographers rotated between day shifts, evening shifts, and those night shifts that Ms. Quigley did not work. In late 2011, Ms. Quigley's schedule was changed to five eight-hour shifts, Wednesday through Sunday, and she agreed to this change. When Ms. Quigley was on FMLA leave in 2012, as explained in more detail below, the Hospital again changed her shift; this time, it implemented a universal rotating shift schedule, meaning that all sonographers – including Ms. Quigley – would rotate between day shifts, evening shifts, and night shifts. (*See* DTX 8-A).[3] Although this change affected all sonographers, it most dramatically affected Ms. Quigley, who was the only technician not already on a rotating schedule. Ms. Quigley learned of this change at least by May 24, 2012, while she was still on leave and shortly before she was to return to work on May 30, 2012. (DTX 7, 8-A, 8-B). After learning of it, Ms. Quigley objected, (*see* DTX 10), and did not return to work. She was then separated from employment effective June 4, 2012. (PTX 14).

      This court credits the explanation offered by the defendants of how the universal rotating schedule was developed and implemented. The impetus for the schedule dates back at least to November 25, 2011, when the Hospital failed to secure night-shift ultrasound coverage after the plaintiff called out sick and did not come to work that evening. (*See* DTX 4-A, 4-B). In response, defendant Sherry Mace, the manager of the imaging department, began contemplating a move to a universal rotating schedule, which in her view would make it easier to ensure coverage in case of last-minute call outs. She discussed this possibility with her superiors in December 2011.[4] By

---

[2] Ms. Quigley worked 14 hours on Friday and 12 hours on Saturday and Sunday. She also worked four additional hours per pay period whenever she could in order to meet her required working hours.
[3] Rotating through the night shift was made mandatory, rather than voluntary, for all sonographers.
[4] Ms. Mace also claims she discussed this possible schedule change with Ms. Quigley during a phone call in late December 2011. To support that assertion, the defendants offer a handwritten note by Ms. Mace indicating that she

2

January 2012, Ms. Mace had decided to implement this change. After consulting with defendant Chris Bumbaugh, the director of human resources, about the proposed change in January 2012, Ms. Mace invited all sonographers to a meeting on February 2, 2012, to discuss the universal rotating schedule. (*See* PTX 6; DTX 6). The Hospital then implemented the new schedule in March 2012, while Ms. Quigley was on leave. Ms. Quigley, who worked on February 2, 2012, but did not attend the meeting, (PTX 5, 6),[5] was on FMLA leave from March 7, 2012, through May 28, 2012.[6] She claims she only learned of the change to a universal rotating schedule in May 2012, shortly before she was scheduled to return to work.

## LEGAL STANDARD

To establish an FMLA interference claim,[7] an employee must prove that (1) she was an eligible employee; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled. *Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 516 (D. Md. 2008). This case centers on the fifth prong.

---

had spoken with the plaintiff about work schedules on December 29, 2011. (DTX 5). Ms. Quigley agrees the phone call took place but denies that they discussed scheduling issues during that phone call. In light of the contemporaneous note, the court finds Ms. Mace's recollection is more likely correct.

[5] Ms. Quigley was approved to use intermittent FMLA leave from January 22, 2012, until February 20, 2012. (DTX 1-G). However, she was not absent from work that entire time, and she worked on February 2, 2012. (*See* PTX 5).

[6] On February 9, 2012, Ms. Quigley requested FMLA leave starting on April 6, 2012, in order to undergo foot surgery. (*See* PTX 6). She planned to be out until May 30, 2016. (DTX 7). But Ms. Quigley was also on FMLA leave from March 7, 2012, until her foot surgery in early April because of both personal health issues and her mother's health issues. (*See* DTX 1-H, 1-I). Her 2012 FMLA allotment was exhausted as of May 28, 2012. (DTX 2).

[7] Interference claims are claims that allege violations of FMLA prescriptive rights. These claims arise under 29 U.S.C. § 2615(a)(1), which states, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *See Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006) (explaining FMLA prescriptive rights).

## ANALYSIS

Upon return from FMLA leave, an employee is generally entitled to be restored to the same position held when the leave commenced or its equivalent. *See* 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.214. With respect to work schedules in particular, an employee "is ordinarily entitled to return to the same shift or the same or an equivalent work schedule." 29 C.F.R. § 825.215(e)(2); *see id.* § 825.216(a)(2) (if a shift has been eliminated, an employee is not entitled to return to work that shift, but if a shift is merely filled by another employee, the employee on leave "is entitled to return to the same shift on which employed before taking FMLA leave").

On the other hand, the right to restoration is not absolute. *Yashenko*, 446 F.3d at 549. A returning employee "has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." *Id.* at 548 (quoting 29 C.F.R. § 825.216(a)). Accordingly, an employer may deny restoration to a previous position or its equivalent for legitimate business reasons that are unrelated to the exercise of FMLA rights. *See id.* at 550 (no liability where plaintiff's position was eliminated in a "legitimate reorganization" of the business while plaintiff was on FMLA leave, and plaintiff would have been discharged even if he had not taken leave); *Santorocco v. Chesapeake Holding Co., LLC*, 2010 WL 2464972, at *5–7 (D. Md. June 10, 2010)[8] (no liability where employer eliminated plaintiff's part-time position, and offered her a full-time position instead, because the change was part of a business reorganization and was not made because plaintiff had requested FMLA leave); *see also Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 723–24

---

[8] Unpublished opinions are cited not for any precedential value but for the soundness of their reasoning.

(4th Cir. 2013) (employer may suspend an employee upon her return from FMLA leave "if it would have taken the same action had the employee never taken leave").[9]

FMLA claims concerning restoration to the same or an equivalent position often fail if the evidence "tends to show that the employer made the [employment] decision prior to the request for FMLA leave, especially when coupled with other evidence supporting the proffered reason" for the decision. *See Santorocco*, 2010 WL 2464972, at *5. In addition, an employment decision may be legitimate – and thus preclude FMLA liability – even if it affects only one employee, *see Yashenko*, 446 F.3d at 550; *Santorocco*, 2010 WL 246972, at *1, 6–7, and it is more likely to be legitimate if the employee had been restored to the same position after taking FMLA leave on several prior occasions, *see Yashenko*, 446 F.3d at 550.

Even assuming Ms. Quigley was not offered the same position or its equivalent upon her expected return from FMLA leave in May 2012, the evidence shows the Hospital had legitimate business reasons for moving all technicians to a rotating shift schedule. The evidence also shows the Hospital had decided to put all technicians on a rotating schedule at least by the end of January 2012 – before Ms. Quigley notified the Hospital she would take FMLA leave to recover from foot surgery. Accordingly, the court concludes that Ms. Quigley would have been required to join all other technicians on a rotating schedule even if she had not taken FMLA leave in March, April, and May 2012. Although the new schedule most dramatically affected Ms. Quigley, it affected all technicians to some degree and, in any event, legitimate business decisions may affect only one employee. The evidence thus demonstrates that no FMLA

---

[9] If an employer denies restoration to the same or an equivalent position, the employer may avoid liability by showing it would have made the same employment decision even if the affected employee had not taken FMLA leave. *See Yashenko*, 446 F.3d at 549. The Fourth Circuit has not resolved, however, if the employer bears the ultimate burden of proof with respect to establishing "the limitations on its obligation to restore the employee." *Id.* The court need not explore this issue, however, because it is irrelevant to the outcome of this case.

violation occurred. That conclusion is bolstered by the fact that the Hospital granted Ms. Quigley FMLA leave every time she requested it and had restored her to a permanent night shift after previous absences.[10]

Ms. Quigley, by contrast, offers no credible evidence rebutting the assertion that a universal rotating schedule served a legitimate business need, because it would help the Hospital secure coverage in case of last-minute call outs and also, as Ms. Mace testified, ensure that all sonographers were familiar with the particular demands of the night shift. She also is unable to show that the Hospital had not, in fact, decided to implement a universal rotating schedule by January 2012. Although the new schedule affected her more dramatically than other technicians and was implemented while she was on leave, that is not enough to establish an FMLA interference claim.

Accordingly, the court concludes the defendants are not liable, because moving to a universal rotating schedule was a legitimate business decision that would have occurred even if Ms. Quigley had not taken FMLA leave.[11]

---

[10] Liability is also inappropriate because the Hospital essentially eliminated the permanent night shift to which Ms. Quigley had previously been assigned: under the new schedule, that permanent night shift no longer existed. Accordingly, Ms. Quigley had no right to return to a permanent night shift. *See* 29 C.F.R. § 825.216(a)(2) (if employee's shift is eliminated while the employee is on leave, the employee "would not be entitled to return to work that shift"); *cf. Yashenko*, 446 F.3d at 548 (employer not required to restore employee to a "non-existent position").

[11] At trial, the defendants also moved for judgment as a matter of law in light of an alleged failure by the plaintiff to establish the elements of her interference claim. In light of the court's conclusions, it need not determine whether judgment as a matter of law would have been appropriate. The court also need not examine the question of the damages to which Ms. Quigley would have been entitled had she prevailed on her interference claim. The court notes, however, that damages likely would have been much less than Ms. Quigley sought. For instance, the plaintiff sought front pay until her estimated age of retirement – even though she had found alternative employment after leaving the Hospital. Such front pay would likely be excessive. *See Dotson v. Pfizer, Inc.*, 558 F.3d 284, 300 (4th Cir. 2009) (noting that, in FMLA cases, trial court "must 'temper' the use of front pay by recognizing 'the potential for windfall' to the plaintiff" and finding no abuse of discretion where trial court denied front pay partly because plaintiff had secured lesser-paying but "comparable" work at another company and an award of front pay would be speculative).

A separate Order of Judgment follows.


January 31, 2017                                      /S/
Date                                          Catherine C. Blake
                                              United States District Judge